1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAOKO ITO, et al., )<br><br>　　　　　　　Plaintiffs, )<br>　　v. )<br><br>BRIGHTON/SHAW, INC., et al., )<br><br>　　　　　　　Defendants. )<br>―――――――――――――― )<br>AND RELATED CROSS-CLAIMS )<br>―――――――――――――― ) | 06 CV 01135 AWI DLB<br><br>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Document # 99) |

This case comes before the Court on Plaintiffs' motion for summary judgment.  Plaintiffs are the heirs and successors in interest to Japanese investors Fumitoshi Ito and Shizuo Miyoshi. Defendants are Robert Carson, John Quiring, Cindy Davis and Craig Davis.  Plaintiffs seek summary judgment against all Defendants for conversion and against Defendant Quiring for breach of fiduciary duty.  For the reasons that follow, the motion for summary judgment will be granted in part and denied in part.

## FACTUAL BACKGROUND

In May 1994, the Brighton Hills Limited Partnership ("Brighton Hills") was formed, with

Case 1:06-cv-01135-AWI-DLB    Document 125    Filed 03/13/08    Page 2 of 19

Robert Carson ("Carson") as General Partner, to own and invest in real property located in the County of Fresno, California. In January 1996, the IQ Properties-BHLP Partnership ("IQ Properties-BHLP") was formed, with John Quiring ("Quiring") as General Partner and Japanese investors Fumitoshi Ito ("Ito") and Shizuo Miyoshi ("Miyoshi") as Limited Partners, "to engage in the business of holding an interest equal to 12 shares of the Brighton Hills Limited Partnership (BHLP) Project on behalf of the limited partners . . . ." Ito and Miyoshi each contributed $1,000,000 into IQ Properties-BHLP and each was to receive a fifty percent ownership interest therein.

However, on March 21, 2002, Quiring, as "Authorized Partner" of another partnership IQ Properties International, purportedly assigned the twelve units in Brighton Hills to Carson personally. In turn, Carson purportedly assigned seven of those twelve units, later reduced to five, to Craig Davis ("Craig") and his wife Cindy Davis ("Cindy"), as joint tenants, only four days later, on March 25, 2002. Carson executed both assignments on behalf of Brighton Hills as its General Partner. Plaintiffs claim that both assignments took place entirely without the knowledge, consent or approval of Ito or Miyoshi and that neither Ito nor Miyoshi received any compensation or return on their investment before or after the assignments.

On or around May 30, 2002, Carson resigned as the General Partner of Brighton Hills and Brighton/Shaw, Inc. ("Brighton/Shaw") became the General Partner of Brighton Hills after Carson's resignation.

Miyoshi died on December 23, 1999 and Ito died on February 28, 2004, both in Tokyo, Japan.

In or around early-November 2005, Plaintiffs claim that the new General Partner, Brighton/Shaw, contacted the Japan Investment Management Agency to investigate the 2002 assignments. Plaintiffs claim they were unaware of the purported assignments prior to that contact. Since then, Plaintiffs claim they have contacted all Defendants and put them on notice of their interest in the units. After the filing of this motion for summary judgment, Carson

2

1  disclaimed all interest as to six of the twelve units in dispute in this case by stipulation dated

2  January 24, 2008 and all parties agreed that those six units are the rightful property of Plaintiffs.

3        Plaintiffs still claim that Defendants secretly converted all twelve partnership units in

4  Brighton Hills through the 2002 allegedly fraudulent assignments without the required notice and

5  approval or the payment of any consideration to Plaintiffs.  Accordingly, Plaintiffs seek summary

6  judgment for conversion against Defendants.  Based on the same set of facts, Plaintiffs claim that

7  Quiring, as General Partner of IQ Properties-BHLP, breached fiduciary duties owed to Plaintiffs.

8  Therefore, Plaintiffs also seek summary judgment against Quiring for breach of fiduciary duty.

9

10                                    **PROCEDURAL HISTORY**

11        On August 25, 2006, the heirs and successors in interest to Ito and Miyoshi, Naoko Ito,

12  Toshie Ito, Takafumi Ito, Michiko Morinaga and Kimiko Miyoshi Price ("Plaintiffs"), filed a

13  complaint in this Court with seven causes of action stemming from alleged fraudulent activity

14  involving the twelve limited partnership units of Brighton Hills in which Ito and Miyoshi held

15  interests.  Since then, other defendants have initiated various cross-claims and counter-claims.

16  Plaintiffs now bring a motion for summary judgment for two of their causes of action against the

17  remaining defendants: Robert Carson, John Quiring, Craig Davis and Cindy Davis

18  ("Defendants").

19        Plaintiffs served Defendants with Requests for Admissions on October 19, 2007.  All

20  Defendants failed to respond by the November 23, 2007 deadline.  Quiring responded to

21  Requests 1 to 35 on December 5, 2007, but objected to the remaining Requests 36-84.  Plaintiffs

22  proceeded to file this motion for summary judgment on December 21, 2007, treating all requests

23  that were not responded to as admitted.

24        In response, Carson, Craig and Cindy filed oppositions to Plaintiffs' motion for summary

25  judgment on January 14, 2008, as well as motions to withdraw deemed admissions, along with

26  declarations explaining their respective delays and responses to Plaintiffs' Statement of

27

28                                              3

1  Undisputed Material Facts.  Plaintiffs filed a reply to the oppositions on January 22, 2008.  To

2  date, Quiring has not responded to the motion for summary judgment.

3       Through stipulation on January 24, 2008, Plaintiffs subsequently withdrew any objections

4  to the timeliness of the responses from Craig, Cindy and Carson.  Plaintiffs also withdrew from

5  their motion for summary judgment the claim against Carson, as General Partner of Brighton

6  Hills, for breach of fiduciary duty.  By the same stipulations, Plaintiffs obtained the right to file a

7  supplemental brief by February 19, 2008, but failed to do so.

8

9  **LEGAL STANDARD**

10       Summary judgment is appropriate when it is demonstrated that there exists no genuine

11  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

12  Fed. R. Civ. P. 56©; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

13  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

14  F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

15  undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

16  Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

17  case turns on a mixed question of law and fact and the only dispute relates to the legal

18  significance of the undisputed facts, the controversy for trial collapses into a question of law that

19  is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

20  1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

21       Under summary judgment practice, the moving party always bears the
    initial responsibility of informing the district court of the basis for its motion, and
22  identifying those portions of "the pleadings, depositions, answers to
    interrogatories, and admissions on file, together with the affidavits, if any," which
23  it believes demonstrate the absence of a genuine issue of material fact.

24  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

25  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

26  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

27

28                                        4

file.'"  <u>Id</u>.  Indeed, summary judgment should be entered, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial.  <u>Id</u>. at 322.  "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  <u>Id</u>.  In such a

circumstance, summary judgment should be granted, "so long as whatever is before the district

court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©, is

satisfied."  <u>Id</u>. at 323.

       If a moving party fails to carry its burden of production, then "the non-moving party has

no obligation to produce anything, even if the non-moving party would have the ultimate burden

of persuasion."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies</u>, 210 F.3d 1099, 1102-03 (9th

Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually exists.  <u>See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire & Marine Ins.</u>, 210 F.3d

at 1103; <u>Nolan v. Cleland</u>, 686 F.2d 806, 812 (9th Cir. 1982); <u>Ruffin v. County of Los Angeles</u>,

607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the

suit under the governing law.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986);

<u>Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn</u>, 322 F.3d 1039, 1046 (9th Cir.

2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.  <u>See Anderson</u>, 477 U.S. at 248-49; <u>Thrifty Oil</u>,

322 F.3d at 1046.

       In attempting to establish the existence of a factual dispute, the opposing party may not

rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First

Nat'l Bank</u>, 391 U.S. at 289; <u>Willis v. Pacific Maritime Ass'n</u>, 244 F.3d 675, 682 (9th Cir. 2001).

However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56©; Fortyune, 364 F.3d at 1079-80. The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

## DISCUSSION

Plaintiffs in this case submitted a Statement of Undisputed Facts ("PSUF"), which formed the basis for much of their motion for summary judgment.  However, the PSUF was filed before Defendants' responded to Plaintiffs' requests for admissions (due to Defendants' own delays) and was largely drafted on the assumption that all of the requests not responded to were admitted.  As explained above, Defendants did ultimately file responses and many of Plaintiffs' undisputed facts are no longer undisputed, especially considering that Plaintiffs waived any objections to the timeliness of Defendants' submissions.  Therefore, the Court has closely examined the record and determined that only the following material facts remain undisputed:

### A.     Undisputed Material Facts

1.     Ito and Miyoshi transferred $2,000,000 to Carson on December 23, 1995.

2.     In return for the $2,000,000, Ito and Miyoshi were to receive a 100% ownership interest in IQ Properties-BHLP, an investment vehicle designed

1          to purchase twelve units in Brighton Hills.[1]

2      3.      Carson was General Partner of Brighton Hills and Quiring was to be

3              appointed General Partner of IQ Properties-BHLP.

4      4.      IQ Properties International purchased twelve units in Brighton Hills for

5              approximately $1,466.666.64.

6      5.      On March 21, 2002, Quiring assigned all twelve units of Brighton Hills in

7              possession of IQ Properties International to Carson personally.  Quiring

8              approved and executed the assignment on behalf of IQ Properties

9              International and Carson approved and executed the assignment on behalf

10             of Brighton Hills.  Craig drafted the legal documents effecting the

11             assignment.

12     6.      On March 25, 2002, Carson assigned seven of the twelve units of Brighton

13             Hills purportedly in his possession, later revised to five units, to Craig and

14             Cindy for the sum of $77,012.  Craig drafted the legal documents effecting

15             the assignment.

16     7.      Neither Quiring, Carson nor Craig sought nor received prior written

17             approval or consent from Ito, Miyoshi or their heirs and successors in

18             interest to conduct the assignments.

19     8.      Neither Quiring, Carson nor Craig paid any consideration to Ito, Miyoshi

20             or their heirs and successors in interest for the assignments.

21

22     ───────────────

       [1] In a Scheduling Order issued by Magistrate Dennis L. Beck, all parties stipulated that
23     Quiring, Ito and Miyoshi formed IQ Properties-BHLP through a limited partnership agreement
       executed on January 15, 1996.  (Doc. # 66).  Plaintiffs submitted the executed agreement as
24     Exhibit 9.  Now, Defendants Carson and Craig and Cindy have filed oppositions denying the
       formation of that partnership.  The only evidence put forth in support of this denial is a citation to
25     a recently filed Declaration by Carson in which he calls the IQ Properties-BHLP Limited
       Partnership Agreement "fraudulently created."  Carson Decl. ¶ 14.  Under Federal Rule of Civil
26     Procedure 16(b), the statements previously stipulated to before Magistrate Beck may only be
       modified upon a showing of "good cause."  Defendants fail to make that showing and that
27     portion of the Declaration is accordingly disregarded.

28                                          8

9.      Miyoshi died on December 23, 1999 and Ito died on February 28, 2004, both in Tokyo, Japan.

10.     Plaintiffs are the surviving heirs of Ito and Miyoshi.

**B.      First Cause of Action — Conversion**

**1.      Plaintiffs' Ownership or Right to Possession of Property**

As this is a diversity action, the Court will look to California law for the elements of Conversion.  Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).

> Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages.  It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use.

Oakdale Village Group v. Fong, 43 Cal. App. 4th 539, 543-544 (Cal. Ct. App. 1996).  Therefore, before moving to the individual claims against Defendants, the Court must first determine whether Plaintiffs have established their ownership or right to possession of the property at the time of the alleged conversion.

It is undisputed that Ito and Miyoshi transferred $2,000,000 to Carson on December 23, 1995.  Ex. 10-12[2]; Carson Responses to PSUF 9.  It is also undisputed that, "[i]n a document dated January 15, 1996, John Quiring, Shizuo Miyoshi and Fumitoshi Ito executed a limited partnership agreement for the purpose of forming IQ Properties-BHLP."  Ex. 13.  The stated purpose of that Limited Partnership Agreement was "to engage in the business of holding an interest equal to 12 shares of the Brighton Hills Limited Partnership (BHLP) Project on behalf of the limited partners . . . ."  Ex. 9.  The Agreement provided that Quiring would serve as General Partner of IQ Properties-BHLP and Ito and Miyoshi would be Limited Partners with 50% ownership interest each in IQ Properties-BHLP.  It also states that "any decisions regarding

---

[2] Unless otherwise stated, any citation to an Exhibit refers to an exhibit to Plaintiffs' motion for summary judgment.

9

1  partners's allocation of net loss and share of distributions . . . will require unanimous decision of
2  the general and limited partners."

3       According to evidence submitted, however, it was not IQ Properties-BHLP that
4  ultimately purchased the twelve partnership units in Brighton Hills, but another similarly named
5  partnership, IQ Properties International, in which Quiring was also General Partner.  Ex. 36.  All
6  parties have continuously used the term "IQ Properties" in an imprecise manner throughout the
7  briefing for this motion, sometimes distinguishing between the two entities but often generalizing
8  and conflating the two.  Either way, it cannot be disputed that one of the two entities purchased
9  the twelve limited partnership units in Brighton Hills for approximately $1,466,666.64.[3]  More
10 importantly, it does not matter for the purposes of this claim because Carson concedes that by
11 some point, at least July 1996, the Japanese investors owned or had a right to possession of the
12 twelve units in Brighton Hills.  See Carson Decl. 15.

13      Based on these undisputed facts, there is no issue over whether Ito or Miyoshi possessed
14 an ownership interest or a right to possession in the twelve units as of, at least, July 1996 and
15 possibly as far back as December 1995.  Carson, Craig and Cindy argue that while Ito and
16 Miyoshi may have possessed the units, Plaintiffs, the surviving heirs of Ito and Miyoshi, never
17 had possession of or even title in the units and therefore cannot maintain an action for
18 conversion.  Instead, they claim, Plaintiffs simply "appear to argue that they possessed an
19 expectancy as the heirs of two individuals who invested in the partnership," (Carson Opp. 7)
20 which falls short of establishing that they held title or possessed the disputed partnership units.
21 However, Plaintiffs are correct in pointing out that in a conversion action under California law,
22 "the plaintiff need show only that he was entitled to possession at the time of conversion."
23 Enterprise Leasing Corp. v. Shugart Corp., 231 Cal. App. 3d 737, 748 (Cal. Ct. App. 1991).

24      It is undisputed that Plaintiffs are the surviving heirs, the widow and/or children, of Ito

25

26
27      [3] Plaintiffs point to tax returns filed by IQ Properties International reflecting the purchase
   of the units in Brighton Hills.  Ex. 33.

28                                              10

and Miyoshi.  Miyoshi died on December 23, 1999.  At that point, his daughters, Plaintiffs Kimiko Miyoshi Price and Michiko Morinaga, immediately succeeded in interest as the rightful owners of Miyoshi's share of the units by operation of law.  Accordingly, they were entitled to possession of the units as of December 23, 1999.  As the alleged conversion took place in March 2002, there is no question that Plaintiff-heirs of Miyoshi may maintain an action for conversion.

Ito was still alive at the time of the assignments.  He retained his ownership interest in the units up to the day of the first assignment,[4] March 21, 2002, and he was entitled to possession of the units at the time of the alleged conversion.  Ito died on February 28, 2004.  Under California law, a cause of action may pass to the decedent's successor in interest, in which case the decedent's successor in interest may commence the action.  Cal. Civ. Proc. Code § 377.30; see also Cal. Civ. Proc. Code § 337.20 ("a cause of action for or against a person is not lost by reason of the person's death").  In addition, the widow and children of Ito also succeeded in interest as the rightful owners of Ito's share of the units by operation of law immediately upon his death.  Any delay in bringing the present action by Plaintiffs or by Ito was apparently caused by Carson's failure to advise either of them of the assignments.  Accordingly, the surviving heirs and successors in interest to Ito, his widow and children, Plaintiffs Naoko Ito, Toshie Ito and Takafumi Ito, may maintain an action for conversion.

Therefore, all Plaintiffs are rightful heirs and may bring an action for conversion for their claim in the disputed Brighton Hills limited partnership units.

## 2.    Claim of Conversion Against Robert Carson

In a California conversion action, Plaintiffs must also establish Defendants' intentional taking of Plaintiffs' property without the consent of Plaintiffs.  Carson claims, essentially, that Ito and/or Miyoshi consented to his taking of the disputed property.

---

[4] Carson claims that Ito relinquished ownership of the units in February 2000.  That claim is discussed and rejected in the following section.

1    Carson claims that he traveled to Japan in February 2000 and met with Ito over dinner.

2    During that meeting, Carson claims that Ito refused to put more money into the investment

3    project and also relinquished his interests in the disputed units.  Carson's only submitted

4    evidence supporting that claim is the following description of their purported meeting:

5    A.          . . . Okay.  The real meeting came a couple days later when I went out to
                 dinner with Ito.  It was just Mr. Ito and myself, and I basically told Mr. Ito, I said,
6                "Listen," I said, "You know, what's happening with the investment?"  And he
                 said, he just told me flat — Japanese will not say it to your face no.
7                       Okay.  You know, I went over there several times.  The last time I met
                 with them that evening we went to some Korean restaurant, and at the meeting I
8                just point blank asked him, I said, "Is the rest of the money coming or is it not
                 coming because the group is getting very upset and things are — you know, I
9                mean we've been going to get these green cards, it's been taking four years and
                 everybody was starting to get — you know, they wanted to move on."  And he flat
10               out told me, he said, "Listen, I'm not going to put any more money in.  I don't
                 care about the two million that went in.  I'm done.  We're washing our hands of
11               it."  And that's when I flew home.
     Q.          Now, is Mr. Ito fluent in English?
12   A.          Broken English.  He understands, but it's hard for him to speak.
     Q.          Was there anybody else at that meeting, dinner meeting?
13   A.          No.
     Q.          Were those his exact words?
14   A.          Yes.
     Q.          He said, "I'm done.  I'm washing my hands of it"?
15   A.          He wasn't going to put up anymore money.
     Q.          But those weren't his exact words?
16   A.          He was very, very —
     Mr. Davidson:          No.  He's asking, washing his hands, did he use those words?
17   The Witness:           No, he never said washing his hands, but basically that's what I got
                            out of it.
18   Mr. Holzworth:         So your account of what he said is —
     A.          "We're done."
19   Q.          Just so I understand, and it's very clear for the record, you're not giving me a
                 verbatim account of what he said at that dinner, correct?
20   A.          Yeah.  I'm just giving you a generalized.
     Q.          In your own words?
21   A.          In my own words.
     Q.          Okay.  And then what happened?
22   A.          Then we went out for cocktails and we stayed out till about 2:00 in the morning.

23   Carson Dep. 131.16-133.13.  In a summary judgment motion, the Court will consider the facts in

24   the light most favorable to the non-moving party, in this case, Defendants.  However, even in the

25   light most favorable to Defendants, based on the language from Carson's deposition quoted

26   above, the Court cannot find that Carson obtained sufficient consent to (1) take and (2) assign the

27

28                                            12

twelve disputed units.

First, Carson admits that he obtained no written authorization from Ito, Miyoshi or Plaintiffs to take or assign the units on or before March 21, 2002.  Carson Responses to PSUF 34.  His only purported authority came from the conversation with Ito in February 2000 described above.  Carson admits that Miyoshi was not present at that meeting, as he died two months earlier in December 1999, and Carson does not claim to have sought or obtained any consent from the heirs of Miyoshi during his trip to Japan.  Accordingly, there is no question that Carson lacked the consent necessary to assign at least six of the twelve units in Brighton Hills—the portion of the units that were, at that point, owned by Miyoshi's daughters.

Second, the Court finds it implausible to read Carson's own account of his conversation with Ito as granting him consent to take and assign the units.  Ito seems to have been very clear that he was not willing to invest any further capital into the project, but that is very different from abandoning interests that were already his.  On the latter, Ito was far from clear.  Carson states that Ito told him he was "washing his hands of it," but then admits Ito never actually used those words; rather, that was what Carson "got out of it," that they were "done."  In addition, Carson admits that Ito speaks only "Broken English."  In California, it is a defense to an action for conversion of personal property that the plaintiff, or the person on whose behalf the action is brought, consented to the act charged as the conversion, either in advance of or simultaneously with the act, or even by subsequent ratification.  Farrington v. A. Teichert & Son, 139 P.2d 80 (Cal. Ct. App. 1943).  In this case, Carson has not offered sufficient evidence of any such consent.

The other elements of the tort of conversion against Carson are undisputed.  Carson admits that he arranged or was involved in the first assignment of the twelve units in Brighton Hills to himself and that no consideration was paid to Ito, Miyoshi or Plaintiffs.

In support of their motion for summary judgment, Plaintiffs submitted a combination of proof and undisputed facts establishing that Ito and Miyoshi had an ownership interest in twelve

1   Brighton Hills limited partnership units that were taken from them.  Carson claims that Ito and/or

2   Miyoshi released their interest in those units to him, but has been unable to produce any evidence

3   that rises to the level of a genuine issue of material fact.  Therefore, the Court grants Plaintiffs'

4   motion for summary judgment for conversion against Defendant Robert Carson.

5

6                   **3.       Claim of Conversion Against Cindy and Craig Davis**

7          Craig and Cindy first argue that Plaintiffs' conversion claim is inappropriate in this

8   context because "it is generally acknowledged that conversion is a tort that may be committed

9   only with relation to personal property and not real property."  The Davis' go on to state that in

10  this case, "the property purportedly converted is limited units in a limited partnership owning real

11  property."  That point is correct—while it is true that Brighton Hills may have owned real

12  property, the property allegedly converted is units in Brighton Hills.  Units in a partnership are

13  personal property subject to conversion.  See Mears v. Crocker First Nat. Bank of San Francisco,

14  191 P.2d 501, 505 (Cal. Ct. App. 1948).  Therefore, conversion, and not trespass to land, is the

15  appropriate cause of action here under California law.

16         The Davis' second and third arguments, that Plaintiffs did not possess the property at the

17  time of the alleged conversion and that Carson claimed Ito and Miyoshi assented to the

18  assignments, respectively, were already discussed and rejected in the sections above.  The Davis'

19  fourth argument, that they qualify as bona fide purchasers for value, merits further discussion.

20         Four days after the twelve Brighton Hills partnership units were assigned to Carson,

21  Carson turned around and assigned seven (later reduced to five) units to Craig and Cindy, as joint

22  tenants.  The Davis' admit that the units were assigned to them and even admit that Craig drafted

23  the legal documents executing both assignments.  In fact, in their opposition brief, they admit

24  that "[i]n the course of discovery in the instant action, substantial evidence was uncovered to

25  suggest that Messrs. Carson and Quiring did not possess the authority to transfer or assign the

26  disputed partnership units acquired by Mr. Davis."  However, the Davis' insist that they

27

28                                                14

1   purchased the units for value and without notice of Carson's and/or Quiring's lack of authority to

2   assign them and thereby qualify as "innocent purchasers for value."

3          As a general rule in California, an innocent purchaser for value and without actual or

4   constructive notice that his or her vendor has secured the goods by a fraudulent purchase is not

5   liable for conversion.  "The elements of a bona fide purchase are payment of value, in good faith

6   and without actual or constructive notice of another's rights.  Absence of notice is an essential

7   requirement in order that one may be regarded as a bona fide purchaser."  Oakdale Village

8   Group, 43 Cal. App. 4th at 547.  In Oakdale Village Group, the defendant satisfied neither

9   requirement.  First, defendant did not purchase the converted funds for "value," defendant only

10  promised to release the partner from his debt.  Second, defendant had knowledge that other

11  partners were involved.  Id. at 549.

12         In this case, it is undisputed that Craig paid approximately $75,000 in exchange for the

13  units.  Though that may be significantly less than the amount originally paid for the units by Ito

14  and Miyoshi, it is "value" nonetheless.

15         The second prong, however, is disputed.  The Davis' maintain that they were entirely

16  unaware that Ito or Miyoshi had any outstanding ownership interests or rights in the units.  Craig

17  claims that "sometime prior to March 21, 2002," the date of the first assignment, Carson told him

18  "that Carson was the beneficial owner of twelve (12) units in Brighton Hills, Ltd. held by a

19  general partnership known as IQ, which was comprised of two partners, to wit, Robert Ishahara

20  and John Quiring."  Craig further claims that Carson also represented to him, in apparently no

21  uncertain terms, "that Carson was the legal and equitable owner of all twelve units and no other

22  person or entity had any claim to the twelve units in Brighton Hills, Ltd."  Davis Decl. 2.  The

23  Davis' admit that they were aware of "two Japanese investors," but only in that "the twelve units

24  were held for Carson's benefit by virtue of 'visa'/immigration services Carson had successfully

25  rendered to two 'Japanese investors.'"  Id.  The Davis' also claim that Quiring assured Craig

26  "that Quiring had the absolute authority to execute a subscription agreement and the assignments

27

28                                              15

that are the subject of this litigation pursuant to the IQ partnership agreement and that he had signed legal documents on behalf of the IQ partnership that had been recorded in dealing with prior real property issues involving IQ." Id. at 4.

Plaintiffs dispute the Davis' innocent buyer status by arguing that Craig had actual or at least constructive notice of their interests in the units.  If Craig had knowledge that the assignments were wrongful, he would not qualify as an innocent buyer even though value was paid for the property.  Oakdale Village Group, 43 Cal. App. 4th at 546.  Plaintiffs point to an adverse-party admission made by Carson in his First Amended Cross-claim against Craig, in which Carson states that "[a]t the time [of the transfer], Carson advised Davis, and Davis was well aware, that the aforementioned Japanese investors had an equitable and legal claim to the 12 units, and/or were limited partners in IQ Properties.  Additionally, Davis was aware that Carson possessed no writing confirming that the Japanese investors had forfeited their rights to the 12 units; Davis only had Carson's representations to rely on." Ex. 20 ¶ 6.  Plaintiffs also highlight a letter written by Craig to Jeffrey Boswell, counsel for Brighton Hills, dated April 3, 2002, approximately a week after the assignments.  The letter discloses the terms of the assignments and states:

> Additionally, and more importantly, agreements have been made with respect to indemnifying the partnership with respect to claims which may be brought by the Japanese investors.  This includes an indemnification of the Limited Partnership by Rob S. Carson with respect to any claim, which may be brought by the Japanese investors.
> As you know, the transaction involving the $2,000,000.00 investment by the Japanese is not as "clean" as one would otherwise expect or desire.

Ex. 25.  Plaintiffs' evidence casts doubt upon Craig's defense, but does not entirely disprove it and the success or failure of the defense would most certainly affect the outcome of the suit.  Therefore, the Davis' have established a genuine issue of material fact.  At this point, the non-moving party need not establish a material issue of fact conclusively in its favor; it is enough to show that it is disputed and need be shown to a trier of fact to resolve the differing versions of the truth at trial.  Accordingly, the Court has no choice but to deny the motion for summary

16

judgment for conversion against Cindy and Craig Davis.[5]

### 4. Claim of Conversion Against John Quiring

Quiring failed to oppose Plaintiffs' motion for summary judgment in any way. In a motion for summary judgment, the moving party must carry the initial burden of demonstrating that there exists no genuine issue of material fact as to any of the elements of the cause of action brought and that the moving party is entitled to judgment as a matter of law. If the moving party meets its burden of proof, the burden shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Nissan Fire & Marine Ins., 210 F.3d at 1103. As Quiring failed to respond, the Court will only analyze whether Plaintiffs meet their burden.

As discussed above, Plaintiffs have established and the Court has determined the following: (1) that Ito, Miyoshi or their heirs and successors in interest were entitled to possession of the disputed partnership units at the time of the alleged conversion and are therefore entitled to bring an action for conversion; (2) that Quiring approved and executed an assignment of the twelve units to Carson personally on March 21, 2002, which amounted to a wrongful taking of the units; (3) that neither Ito, Miyoshi nor their heirs and successors in interest consented to the taking; and (4) that Plaintiffs suffered damages from the taking. Therefore, it is the determination of the Court that Plaintiffs have met their burden and established the elements of conversion by Quiring. The Court grants the motion for summary judgment for conversion against John Quiring.

---

[5] In their reply brief to the Davis' opposition to the motion for summary judgment, Plaintiffs also request the Court to declare them the owners of the five units purportedly held by the Davis' because the Davis' disclaimed their ownership interest in their opposition brief. The Court finds the Davis' supposed disclaimer unclear and will not act on it at this time. If parties can stipulate regarding ownership of the units, they may file a stipulation and proposed order with the Court.

1    **B.    Second Cause of Action — Breach of Fiduciary Duty**

2        **1.    Claim Against John Quiring**

3        Again, as Quiring failed to oppose the motion for summary judgment, the Court will only

4   analyze whether Plaintiffs meet their burden of proof as to the breach of fiduciary duty claim

5   against Quiring.  The elements of a claim for breach of fiduciary duty under California law are

6   "the existence of a fiduciary relationship, its breach, and damage proximately caused by that

7   breach."  Amtower v. Photon Dynamics, Inc., 71 Cal. Rptr. 3d 361, 377 (Cal. Ct. App. 2008).

8        Here, Plaintiffs claim that a fiduciary relationship existed between Quiring and Ito and

9   Miyoshi and, upon the deaths of Ito and Miyoshi, their heirs and successors in interest through

10  the IQ Properties-BHLP limited partnership.  In California, fiduciary duties exist among partners

11  in a partnerships.  "Partnership is a fiduciary relationship, and partners are held to the standards

12  and duties of a trustee in their dealings with each other. . . .  A general partner of a limited

13  partnership is subject to the same restrictions, and has the same liabilities to the partnership and

14  to the other partners as in a general partnership."  Everest Investors 8 v. McNeil Partners, 8 Cal.

15  Rptr. 3d 31, 40 (Cal. Ct. App 2003) (internal citations omitted).  Plaintiffs point to the Limited

16  Partnership Agreement for IQ Properties-BHLP dated January 15, 1996 and executed by Quiring,

17  Ito and Miyoshi.  Ex. 9.  Evidence of the formation of the partnership establishes that a fiduciary

18  relationship existed between the partners.  However, Plaintiffs cite no authority to support the

19  claim that the same fiduciary duty was also owed to them.  Plaintiffs do submit the Brighton

20  Hills Limited Partnership Agreement as Exhibit 1 to their reply brief, which states that "The

21  person or persons entitled to the deceased Partner's Partnership interest . . . shall become a

22  Substituted Limited Partner with all the rights and obligations of the deceased Partner . . . ," but

23  they offer no evidence that Ito and/or Miyoshi were partners in Brighton Hills.

24        As to the actual breach of fiduciary duty by Quiring, Plaintiffs' only claim in the motion

25  for summary judgment is that Quiring breached his duties when he "engaged in self-dealing and

26  benefitted substantially when Davis paid off his $70,000 debt to Brighton Hills and also paid him

27

28                                       18

$2,500 outright." However, the evidence they submit is not sufficient to prove that claim. The Assignment Agreement that Plaintiffs cite here was executed by Quiring as general partner of IQ Properties International, a separate partnership from IQ Properties-BHLP, in which neither Ito nor Miyoshi were partners. Plaintiffs fail to carry their burden of proof with respect to this claim. Therefore, the motion for summary judgment for breach of fiduciary duty against John Quiring is denied.

## **ORDER**

Based on the above memorandum opinion, the Court ORDERS that:

1.  Plaintiffs' motion for summary judgment for conversion against Defendant Robert Carson is GRANTED;

2.  Plaintiffs' motion for summary judgment for conversion against Defendants Cindy and Craig Davis is DENIED;

3.  Plaintiffs' motion for summary judgment for conversion against Defendant John Quiring is GRANTED; and

4.  Plaintiffs' motion for summary judgment for breach of fiduciary duty against Defendant John Quiring is DENIED.

IT IS SO ORDERED.

**Dated:    March 12, 2008**              _____/s/ Anthony W. Ishii_____
                                          UNITED STATES DISTRICT JUDGE